**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**CHARLES COX, Individually and on Behalf of Others Similarly Situated,**

**Plaintiffs,**

**v.**

**LABOR SOURCE, LLC d/b/a ONE SOURCE LABOR STAFFING,**

**Defendant.**

**Case No. 22-2420-JAR**

# MEMORANDUM AND ORDER

Plaintiff Charles Cox brings this collective action under the Fair Labor Standards Act ("FLSA"), alleging that Defendant Labor Source, LLC d/b/a One Source Labor Staffing ("Labor Source") willfully failed to pay its employees overtime compensation for travel time and pre-shift waiting time. Before the Court are Defendant's Motion to Decertify Plaintiffs' FLSA Collective Action Claims (Doc. 163), Defendant's Motion for Full or Partial Summary Judgment (Doc. 165), and Plaintiff's Motion to Allow Representative Testimony (Doc. 171). The motions are fully briefed, and the Court is prepared to rule. For the reasons explained below, the Court grants in part and denies in part Defendant's motion to decertify, grants in part and denies in part Defendant's motion for summary judgment, and denies without prejudice Plaintiff's motion to allow representative testimony.

## I. Procedural Posture

Plaintiff Charles Cox filed this putative collective and class action alleging claims under the FLSA, New York, and Ohio law for unpaid overtime, unreimbursed business expenses, and improper deductions from his and others' pay. On October 6, 2023, the Court conditionally certified Count I as an FLSA collective action comprising:

> All persons who are, or have been employed by Defendant as manual laborers and other individuals with similar job titles within the United States at any time during the last three years, except those who worked exclusively in North Carolina.[1]

Notices were sent to potential members of the collective and the case proceeded to discovery. 1,139 individuals, including Cox, filed written consents to join the lawsuit as party plaintiffs under 29 U.S.C. § 216(b). Four individuals who previously filed consents to join the lawsuit have withdrawn from the case.

In the Pretrial Order, Plaintiffs abandon their FLSA claim based on unreimbursed expenses and improper deductions. Their collective action now alleges that Defendant failed to pay them their regular rate of pay and overtime premiums related solely to travel time and pre-shift waiting time.[2] Plaintiffs also abandon their New York and Ohio state law claims.[3]

Discovery is now complete, including 14 opt-in Plaintiff depositions and 243 written discovery responses by opt-in Plaintiffs. Defendant maintains that discovery reveals evidence warranting (1) decertifying the collective and dismissing improperly joined Plaintiffs, and (2) summary judgment. Plaintiffs partially oppose decertification and summary judgment, although they concede that four opt-in Plaintiffs can be dismissed because there are no records that they were employed by Defendant. Plaintiffs also ask to narrow the collective to individuals who worked overnight jobs only. Because the ruling on Defendant's decertification motion will determine the scope of the Court's summary judgment inquiry, it addresses that motion first.

---

[1] Doc. 34 at 18.

[2] Doc. 159 at 10 & n.3.

[3] *Id.* at n.2.

## II. Motion to Decertify

### A. Standard

An action under the FLSA may be brought "against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."[4] Unlike a class action under Fed. R. Civ. P. 23, to participate in a FLSA collective action, all plaintiffs must "consent in writing to become such a part," and each consent must be "filed in the court in which such action is brought."[5]

The court may certify an opt-in collective action so long as the aggrieved employees are similarly situated.[6] This Court has followed the two-step process authorized by the Tenth Circuit in *Thiessen v. General Electric Capital Corp*.[7] First, the Court conditionally certified the collective after it determined that Plaintiffs were similarly situated for purposes of sending notice of the action to potential members of the collective action.[8] The case is now at the second step of the two-step *ad hoc* framework: determining whether a suit may proceed collectively under the FLSA now that discovery is complete.[9] In ruling on a motion to decertify, "the court . . . makes a second determination, utilizing a stricter standard of 'similarly situated.'"[10] If the claimants are indeed similarly situated, "the district court allows the representative action to proceed to trial."[11] If the claimants are not similarly situated, the district court decertifies the collective, dismisses

[4] 29 U.S.C. § 216(b).

[5] *Id.*

[6] *Id.*

[7] 267 F.3d 1095, 1102–03 (10th Cir. 2001).

[8] Doc. 34 at 7–8.

[9] *Thiessen*, 267 F.3d at 1102–03.

[10] *Id.* at 1103.

[11] *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 90–91 (2003).

the claims of the opt-in plaintiffs without prejudice, and the original plaintiff proceeds to trial on the individual claims.[12]

In determining whether Plaintiffs have satisfied their burden to establish that they are similarly situated, the Court "reviews several factors, including (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."[13] Whether to decertify a collective action is within the district court's discretion.[14]

**B. Factual Background**

The following facts and claims are set forth in the Pretrial Order. Defendant is a staffing company based in Mission, Kansas that recruits and assigns unskilled and semi-skilled workers to job sites nationwide. Defendant provides workers to third-party customers. These workers perform manual labor for projects within construction, manufacturing, fulfillment, disaster-restoration (including fire and water restoration) and other general labor fields. Defendant also employs and provides its customers with manual laborers, non-commercial drivers, crew leaders, cleaning crew members, hospitality workers, warehouse workers, and light industrial workers (including forklift operators, pickers, packers, truck loaders, and assembly line workers). Defendant's customers pay Defendant based on the number of hours worked by the employees staffed by Defendant, including any overtime hours. The number of employees Defendant provides to its customers depends on the specifics of the customer's project.

---

[12] *Id*.

[13] *Thiessen*, 267 F.3d at 1103 (quoting *Vaszlavik v. Storage Tech. Corp*., 175 F.R.D. 672, 678 (D. Colo. 1997)). *Thiessen* includes a fourth factor—"whether plaintiffs made the filings required by the ADEA before instituting suit," which is not applicable to FLSA cases. *Id.* (quoting *Vaszlavik*, 175 F.R.D. at 678).

[14] *Id*. at 1102.

Defendant dispatches two categories of workers: (1) local workers from local staffing offices to perform daily jobs for customers in the same metropolitan area; and (2) overnight travel workers, who are dispatched in crews to remote projects across the country. In their response to Defendant's motion to decertify, Plaintiffs narrow their FLSA claim, agreeing "that this Court should decertify and dismiss without prejudice only those employees who worked purely local, day-to-day staffing jobs," and limit the collective to "overnight travel workers, who Labor Source subjected to common, company-wide policies that uniformly and illegally denied them pay for compensable hours."[15]

As to those overnight travel workers, Plaintiffs contend that they are entitled to compensation for (1) travel time, including commutes between their hotels and job sites; and (2) pre-shift waiting time because Defendant required employees to arrive at their job site 15 minutes before their scheduled shift. Plaintiffs maintain that Defendant utilized "crew leads" at each job site, who did not accurately record Plaintiffs' travel time and waiting time, and who pressured workers into signing inaccurate time sheets. To show that the opt-in Plaintiffs are similarly situated, Plaintiffs rely on deposition testimony by Defendant's corporate representative, Robert Reese, and its Director of Staffing Operations, Ernest Arellano. Plaintiffs also cite employment policies, representative deposition testimony from 14 opt-in Plaintiffs, and questionnaires completed by opt-in Plaintiffs.

Defendant contends that the opt-in Plaintiffs worked on projects for hundreds of customers in over 1,800 different locations and that each customer had different policies and procedures. Defendant disputes that crew leads had any management authority over employees; they merely served as liaisons between the customers and crew members. Additionally,

[15] Doc. 170 at 6.

Defendant claims that it requires employees to accurately report their time using time sheets and prohibits off-the-clock work. Thus, to the extent the timesheets are inaccurate, Defendant maintains it lacked actual or constructive knowledge that Plaintiffs were not being paid for all the time they worked because it relied on the timesheets. Defendant relies on written discovery, including responses from opt-in Plaintiffs to its discovery questionnaire; time sheets and paystubs; and deposition testimony.

### C. Partial Decertification

The Court first addresses Plaintiffs' request for partial decertification of the opt-in Plaintiffs who are local employees. Plaintiffs concede that these workers, who drive themselves to local work sites, are not similarly situated to overnight travel workers, who must comply with the travel time and waiting time policies challenged here. Thus, Plaintiffs ask the Court to amend the FLSA collective as follows:

> All persons who are, or have been employed by Defendant as manual laborers and other individuals with similar job titles on overnight travel crews within the United States at any time during the last three years, except those who worked exclusively in North Carolina.[16]

Plaintiffs further ask the Court to dismiss the local workers from this action without prejudice. Defendant does not object to narrowing the class definition but asks the Court to (1) dismiss the local workers with prejudice because they have no viable claim, and (2) order the parties to meet and confer to determine the specific opt-in Plaintiffs who should be dismissed, subject to additional briefing if they cannot agree.

The Court grants Plaintiff's request to amend the collective and dismiss without prejudice those opt-in Plaintiffs who do not qualify as overnight workers. "The narrowing of a FLSA

---

[16] *Id.* at 19.

collective is common practice."[17] "If some opt-in plaintiffs are not situated similarly to the lead plaintiff, the most efficient course may be to grant the defendant's de-certification motion in part, dismiss the non-conforming opt-in plaintiffs' claims without prejudice and narrow the scope of the FLSA collective action."[18] Defendant offers no authority for the proposition that the local workers in this case should be dismissed with prejudice based on a finding that they are not similarly situated to the named Plaintiff, an inquiry that does not decide the merits of the case.[19] Thus, dismissal of the non-conforming Plaintiffs is without prejudice.

However, the Court grants Defendant's request in the reply brief to order the parties to meet and confer about which opt-in Plaintiffs belong in the "local workers" category and should be dismissed. Defendant points to a discrepancy in the record: Reese identifies 430 qualifying opt-in Plaintiffs,[20] while Plaintiff's expert witness identifies a different number.[21] The parties shall file a joint status report stating whether they have reached agreement on the list of opt-in Plaintiffs who are not part of the amended collective. If the parties cannot agree, the Court will set either a status conference or briefing schedule on this issue.

Having dismissed local workers from the collective, the Court proceeds to consider whether suit may proceed collectively for the remaining opt-in Plaintiffs now that discovery is complete.

[17] *Deakin v. Magellan Health, Inc.*, 807 F. Supp. 3d 1318, 1336 (D.N.M. 2024) (collecting cases).

[18] *Pruess v. Presbyterian Health Plan, Inc.*, 745 F. Supp. 3d 1218, 1247 (D.N.M. 2024) (alteration omitted) (quoting *Hill v. R+L Carriers, Inc.*, No. C 09-1907, 2011 WL 830546, at *4 (N.D. Cal. Mar. 3, 2011)).

[19] Defendant's request that the Court *sua sponte* dismiss with prejudice is not well taken. Defendant does not acknowledge or discuss the requisite factors for dismissal with prejudice under *Ehrenhaus v. Reynolds*, 965 F.2d 916 (10th Cir. 1992), and the Court declines to conduct that analysis without briefing from either party.

[20] Doc. 166-26 at 3 (Reese Decl. ¶ 9).

[21] Doc. 164-34 at 9–10 (Rogers Suppl. Report 2–3).

### D. Discussion

#### 1. Disparate Factual and Employment Settings

The first factor for the Court to consider at the decertification stage is the disparate factual and employment settings of the individual opt-in Plaintiffs. On this factor, courts generally require "substantial evidence of a single decision, policy or plan."[22] The Court also considers the similarities and dissimilarities in the Plaintiffs' employment responsibilities and circumstances.[23] "Decertification will be granted where the claimants' responsibilities and duties were so varying that it cannot be said they share a factual nexus based on a particular policy or practice."[24] However, "[t]he Opt-In Plaintiffs need not be *identically* situated, and differences among the Opt-Ins do not require decertification so long as the differences are immaterial and are 'outweighed by the similarities between' them."[25]

Plaintiffs' FLSA claim is based on Defendant's travel and waiting time policies, which they maintain are supported by substantial evidence. The parties dispute whether the dissimilarities among the opt-in Plaintiffs are material. The Court considers the parties' arguments with respect to each policy below, mindful that its inquiry at this stage is whether the opt-in Plaintiffs are similarly situated such that their claims should be decided collectively. The Court does not wade into the merits.[26]

---

[22] *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1001 (D. Kan. 2018) (quoting 1 McLaughlin on Class Actions § 2:16 (14th ed. 2017)).

[23] *Id.*

[24] *Id.* (quoting 1 McLaughlin on Class Actions § 2:16).

[25] *Bowling v. DaVita, Inc.*, No. 21-CV-03033, 2026 WL 2066119, at *3 (D. Colo. July 17, 2026) (quoting *Levine v. Vitamin Cottage Nat. Food Mkts., Inc.*, No. 20-cv-00261, 2023 WL 3648684, at *5 (D. Colo. May 25, 2023)).

[26] *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1106–07 (10th Cir. 2001) (finding that district court erred by "effectively ma[king] findings regarding . . . [factual] issues in the guise of determining whether plaintiffs were 'similarly situated'").

**a. Travel Time**

**i. Relevant Facts**

Defendant dispatches employees to projects located nationwide through its many field offices. Overnight workers testified that they are required to meet at a field office and attend a meeting, then board company vans and travel together to the worksites, sometimes traveling hundreds of miles from workers' homes. There is no dispute that Defendant had a policy that it did not compensate overnight workers for travel time unless it occurs between 8:00 a.m. and 5:00 p.m ("travel time policy" or "travel policy"). Any travel time outside that window was unpaid with the exception of employees who actually drive crews to and from job locations. Those drivers are paid for all their driving time, regardless of whether it occurs during normal working hours.

Overnight workers signed a Terms of Employment (Out of Town) ("OOT Agreement") with Labor Source that includes the following travel time provision:

> TRAVEL TIME: I understand that I will receive travel time pay at $___ per hour based on DOL guidelines and time determined using Google Maps. I understand the actual work hours will potentially vary from day to day and I agree that **8AM to 5PM** is a reasonable approximation of the normal day, inclusive of travel time. In the event that I am terminated or quit for any reason, I understand that One Source is not required to transport me back home. In the event One Source does transport me back home after I am terminated or quit I understand that I will not be receiving travel pay for the time spent traveling home as I am no longer an employee, and I also understand and agree that I will owe One Source for the cost of transporting me home . . . .[27]

[27] Doc. 169-1 at 354.

Reese confirmed that the OOT Agreement was provided to all overnight employees, regardless of the client they worked for, and that Labor One deemed 8 a.m. to 5 p.m. to be normal working hours.

When overnight workers travel out of town to a work site, they typically stay in a hotel. Defendant's policy is that it does not pay for travel time of less than one hour from the hotel to the work site, although some exceptions have been made since 2020 for commutes of shorter duration when Labor Source has been able to negotiate payment with its customers. According to Reese, Labor Source's pay records show that at least 266 of the opt-in Plaintiffs were paid commuting time on one or more paychecks.

Arellano oversees the only two Labor Source branches that currently manage overnight workers: Harlington, Texas and Orlando, Florida. He has worked for the company since 2019. Arrellano testified in his deposition that it is common for overnight workers to work beyond the 8:00 a.m. to 5:00 p.m. schedule; an 11- or 12-hour shift is "common."[28] Arrellano is aware of workers leaving for their commute as early as "4:00 or 5:00 in the morning," and ending their workday as late as "11:00 p.m., 12:00 p.m."[29] Several opt-in Plaintiffs confirm that they routinely worked well beyond the hours of 8:00 a.m. to 5:00 p.m.[30] And several testified by deposition that they traveled long distances in company vans to worksites, sometimes requiring multiple travel days.[31]

---

[28] *Id.* at 38–39 (Arellano Dep. 30:10–24, 31:5–10).

[29] *Id.* at 37–38 (Arellano Dep. 29:23–30:5)

[30] *Id.* at 458 (Roland Qu. ¶ 2), 461 (Rodriguez Qu. ¶ 2), 464 (Rothermich Qu. ¶ 2), 74 (Bourbois Dep. 44:4–11).

[31] *See, e.g.*, *id.* at 62 (Bledsoe Dep. 14:2–20), 107–10 (Grover Dep. 16:3–19:10), 128–29 (Jackson Dep. 38:2–39:24).

According to Reese, Labor Source's pay records show that at least 681 of the opt-in Plaintiffs were paid overtime on one or more paychecks, for more than 81,700 hours of overtime.[32] 552 of the opt-in Plaintiffs who have joined this case were paid for travel time on one or more paychecks, and at least 423 of the opt-in Plaintiffs were paid for travel time at the overtime pay rate on one or more paychecks.[33]

Defendant requires its employees to accurately record all of their time worked on timesheets. The time sheet forms and processes can vary from one client to another. Sometimes, employees individually sign off on their hours worked each day or week that they submit to Labor Source, and other times crew leads will record the employee's time worked each day and submit the timesheets to Labor Source. Either way, Labor Source maintains that it paid its employees based on the hours reflected on the time sheets.

**ii. Travel Time Standards**

Defendant does not dispute that the opt-in Plaintiffs were subject to a uniform Labor Source policy of not paying overnight workers travel pay, at least for passengers, unless the travel occurred between 8 a.m. and 5 p.m. But Defendant maintains that under the governing regulatory framework, individualized inquiries are required to determine (1) when and what kind of travel for each person occurred, and (2) whether the time spent traveling is compensable.

Under the FLSA, employers must pay their employees minimum wage for a 40-hour workweek, and for hours worked in excess of 40 hours per week, they must pay a rate of one and one-half times the regular rate of pay.[34] For purposes of the FLSA, the Portal-to-Portal Act

[32] Doc. 166-26 at 4 (Reese Decl. ¶ 10).

[33] *Id.* (Reese Decl. ¶ 11).

[34] 29 U.S.C. § 207(a)(1). The Court notes that Plaintiff's claim as stated in the Pretrial Order seeks unpaid wages at the "regular rate of pay, as well as overtime premiums for travel time and pre-shift wait time." Doc. 159 at 10. Plaintiffs' response to the motion to decertify focuses on unpaid overtime. Defendant is correct that the FLSA does not provide a remedy for unpaid wages at a "regular rate of pay," but overtime hours must be compensated "at

provides that "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" and "activities which are preliminary to or postliminary to said principal activity or activities" are generally not compensable.[35] This means that "activities performed either before or after the regular work shift, on or off the production line, are compensable . . . if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1)."[36]

The parties rely on different Department of Labor ("DOL") regulations construing how these rules apply to travel. Plaintiffs claim that 29 C.F.R. § 785.38 applies here, making all travel time by overnight workers compensable because overnight workers were required to report to the local work site before traveling to the customer's location in company vans.[37] Defendant responds that § 785.38 only applies to travel time within the workday, and argues that the time spent by passengers traveling outside their workday to out-of-town job sites was not part of their "principal activity," so it should not be counted as compensable time. Defendant argues that 29 C.F.R. § 785.39 applies instead, which provides that "[t]ravel away from home is clearly worktime when it cuts across the employee's workday. The employee is simply substituting travel for other duties."[38] Defendant argues it complied with this DOL regulation because it paid its overnight workers for travel that takes place during their normal working hours of 8 a.m. to 5

---

a rate not less than one and one-half times the regular rate at which [the employee] is employed." *Id.* The statute sets forth how to determine an employee's regular rate for purposes of determining overtime. *Id.* § 207(e).

[35] 29 U.S.C. § 254(a), (d).

[36] *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956).

[37] 29 C.F.R. § 785.38 ("Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice.").

[38] *Id.* § 785.39.

p.m. And to the extent Defendant did not pay these travelers for their travel time, Plaintiffs would only be entitled to that unpaid travel time if it occurred between the hours of 8:00 a.m. and 5:00 p.m.

Thus, Defendant maintains that the governing regulation, 29 C.F.R. § 785.39, will require individual determinations about what time of day each worker traveled, whether they were a driver or a passenger, and how many hours each person worked in a particular workweek. This last inquiry is key, Defendant argues, because it will determine if that person is entitled to overtime, rather than straight pay. Defendant also urges that each customer handled their timesheets differently, which will require individualized inquiries. And Defendant points to inconsistencies with certain opt-in Plaintiffs' deposition testimony.

Plaintiffs respond that the focus at this stage is on the policy, and there is no dispute that Defendant has a uniform policy on travel time that applies to all overnight workers, regardless of which customer they work for and which timesheet they use. Plaintiff argues that minor inconsistencies or credibility issues with the opt-in Plaintiffs' testimony is immaterial and should not impact the decertification inquiry.

The Court finds that the differences between the overnight workers in the collective are outweighed by the similarities, and that there is substantial evidence that they were subject to a single or uniform pay policy—the key question on this first factor.[39] As stated above, the fact that Defendant applied a single policy to all overnight workers is undisputed. And although Defendant contends that it paid drivers for some travel time, even outside the hours of 8:00 a.m.

---

[39] *See, e.g.*, *Lozoya v. All Phase Landscape Constr., Inc.*, No. 12-CV-1048, 2014 WL 222104, at *2 (D. Colo. Jan. 21, 2014) ("It is immaterial (except as may concern damages, should Plaintiffs ultimately prevail) that Plaintiffs worked on different crews, worked on different job sites, and had different supervisors and foremen. What is imperative is that I find Plaintiffs' evidence to support a finding that the proposed class was subject to the same challenged pay policies.").

and 5:00 p.m., the evidence suggests that all of the overnight employees were given the OOT Agreement with Defendant's policy. The evidence submitted by the parties also suggests that the opt-ins worked at least 40 hours per week on average. As Arrellano acknowledged, 12-hour shifts were common. And the questionnaires make clear that the opt-in Plaintiffs worked more than 40 hours per week for at least some weeks. Defendant provides no evidence of opt-in Plaintiffs consistently working less than 40 hours per week.[40] In fact, in a random sampling, the Court could not find any questionnaires showing a Plaintiff who worked less than 40 hours per week.

The Court also rejects Defendant's credibility concerns. Although "district courts have considered whether excessive individualized credibility inquiries would overcomplicate a collective action and undermine its purpose of addressing many claims at once," the issues Defendant cites do not require decertification."[41] For example, Defendant points to inconsistencies between opt-in Plaintiffs' testimony about whether they were in fact paid for travel time, with some admitting they were paid for at least some travel time. But this is not the sort of issue that warrants decertification. Plaintiff intends to offer evidence that the opt-in Plaintiffs were confused about whether they were properly paid for travel time due to a lack of transparency with their earning statements. And of course "[i]t is common practice in FLSA overtime cases for plaintiffs to argue that they worked overtime and for defendants to argue to

[40] *See Charbonneau v. Mortg. Lenders of Am. L.L.C.*, No. 18-cv-2062-HLT-ADM, 2021 WL 84171, at *6 (D. Kan. Jan. 11, 2021) (finding sufficient evidence in the record to deny motion to decertify overtime claim where the opt-in Plaintiffs worked more than 40 hours per week in at least some weeks). Defendant relies on *Rindfleisch v. Gentiva Health Services*, for the contention that the opt-in Plaintiffs will require individual determinations on liability. 22 F. Supp. 3d 1295, 1303 (N.D. Ga. 2014). But, unlike in *Rindfleisch*, there is no evidence here that Plaintiffs did not work overtime hours. *See id.* ("Here, the fact that some Plaintiffs did not actually work overtime hours, creates a disparate factual setting among the individual Plaintiffs as the issue of liability is not susceptible to common proof.").

[41] *See Deakin v. Magellan Health, Inc.*, 807 F. Supp. 3d 1318, 1338 (D.N.M. 2024) (finding that discrete inaccuracies and conflicts between opt-in Plaintiff testimony do not require decertification).

the contrary; such disputes do not necessitate decertification."[42] Notably, such testimony does not necessarily defeat Plaintiffs' claim because Plaintiffs do not contend that Defendant failed to pay the opt-in Plaintiffs any travel time. Plaintiffs contend that Defendant failed to pay them overtime for travel time outside the hours of 8:00 a.m. and 5:00 p.m.

The Court finds that Plaintiffs have demonstrated substantial evidence of a single travel policy or plan that they claim caused overnight workers to be denied overtime pay, despite the dissimilarities in their worksites, supervisors, and time sheets. Thus, the disparate factual and employment settings factor weighs in favor of collective treatment for overnight workers as to the travel policy claim.

**b. Waiting Time**

As described above, the Portal-to-Portal Act excludes from the definition of compensable work "time devoted to activities which are preliminary to or postliminary to the employee's principal activity or activities."[43] And whether pre-shift waiting time is compensable turns on whether the employee engages in "activities which are an 'integral and indispensable part of the principal activities.'"[44] To be "integral and indispensable" an activity must be "an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities."[45] To illustrate these standards, DOL regulations "explain that the time spent by an employee in a chemical plant changing clothes would be compensable if he 'c[ould

[42] *Id.* at 1339; *see also Underwood v. NMC Mortg. Corp.*, No. 07-2268, 2009 WL 1322588, at *4 (D. Kan. May 11, 2009) (finding individual determinations were not fatal to decertification where the defense was the same as to all Plaintiffs: "Plaintiffs did not work overtime and even if Plaintiffs did work overtime, Plaintiffs were appropriately compensated").

[43] *Peterson v. Nelnet Diversified Sols., LLC*, 15 F.4th 1033, 1037 (10th Cir. 2021) (citation modified).

[44] *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29–30 (2005)).

[45] *Id.*

not] perform his principal activities without putting on certain clothes' but would not be compensable if 'changing clothes [were] merely a convenience to the employee and not directly related to his principal activities.'"[46]

Several deponents testified that Defendant required them to arrive at least 15 minutes early for their scheduled shift to engage in work such as meeting with the customer's project manager, safety meetings, or donning PPE, but that they were not paid for these pre-shift activities. Defendant argues that the opt-in Plaintiffs do not uniformly allege to have been subject to a waiting time policy, and those who did will require individualized determinations about what they did during that waiting period (e.g., donning and doffing, waiting, or attending meetings), and whether Defendant had reason to know of their off-the-clock work. Plaintiffs again insist that there was a company-wide policy that required workers to report at least fifteen minutes before a scheduled shift to attend meetings or don PPE.

Unlike the travel time policy, Plaintiffs do not come forward with substantial evidence of a waiting time policy that applied uniformly to the remaining opt-in Plaintiffs.[47] Plaintiffs rely on Jennifer Squires' deposition testimony about her experience training Defendant's employees. Squires was a customer service representative for Labor Source between 2019 and 2021 at its Goldsboro, North Carolina office. Squires testified by deposition in a different FLSA case against Labor Source[48] that "[w]hen I did my training, I asked them to be there 15 minutes early, that way they could get in the location they needed to be."[49] But Squires did not testify in this

[46] *Id.* at 34 (alteration in original) (quoting 29 C.F.R. § 790.8(c)).

[47] In fact, there is no evidence in the record tying waiting time practices exclusively to overnight workers.

[48] Squires' deposition is from *Speight v. Labor Source, LLC*, No. 21-cv-112-FL (E.D.N.C.), another collective action that was brought on behalf of: "All current and former manual laborers employed by Defendant Labor Source, LLC (d/b/a One Source Staffing and Labor and/or CATSTAFF) on any project in North Carolina, at any time during the period from August 12, 2018 to the present." Doc. 181-3.

[49] Doc. 169-1 at 254 (Squires Dep. 31:1–9).

excerpt that she conducted company-wide training where she or anyone else from Labor Source instructed employees outside of North Carolina, overnight or otherwise, to arrive 15 minutes ahead of their schedule as a policy. The cited testimony also does not support that she formulated pay policies for the company, or that she had firsthand knowledge about whether overnight workers were required to report to their worksites early outside of North Carolina. This is important because this collective action explicitly excludes workers in North Carolina. Thus, the Court finds that Squires' testimony does not demonstrate that there was a uniform pre-shift waiting time policy or plan that applied to members of the collective.

Plaintiffs also rely on several deposition excerpts from the opt-in Plaintiffs. But the Court finds that their testimony does not constitute substantial evidence of a uniform pre-shift waiting time plan or policy.[50] To be sure, several opt-in Plaintiffs testified that they were directed and expected to arrive at job sites at least 15 minutes before their shifts started and that they would not be paid for that additional time. Grover testified that Defendant wanted the workers to meet the project managers and make a good impression.[51] Two opt-ins—Lewis and Bourbais—attest in their declarations that they were trained by the company to arrive at least 15 minutes before their shift started, but to only record their shift time, not their arrival time, on their timesheets.[52] And Cox believes he should have been compensated "for at least 5–10 hours of pre-shift idle time per week on each project."[53]

---

[50] *See* 29 U.S.C. § 254(a)(2) (providing that time spent on "activities which are preliminary to or postliminary to [the employee's] principal activity or activities" is not compensable); *Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1276 (10th Cir. 2020) (determining whether pre-shift activities are "preliminary to or postliminary to a principal activity or activities" which requires deciding what constitutes an employee's "principal activity or activities." (quoting 29 U.S.C. § 254(a)(2))).

[51] *See, e.g.*, Doc. 169-1 at 111–12 & 115–16 (Grover Dep. 30:20–31:16, 43:15–44:2); *see also id.* at 72–73 (Bourbais Dep. at 30:20–31:7), 180 (Love Dep. 22:12–24).

[52] Doc. 169-1 at 7 (Lewis Decl. ¶ 4), 9 (Bourbois Decl. ¶ 4).

[53] *Id.* at 8 (Cox Decl. ¶ 5).

But the extent of this pre-shift work and the activities the workers performed varied. As Defendant notes, 107 of the 243 Plaintiffs who responded to written discovery questionnaires stated that they did not or do not recall working off-the-clock.[54] 45 opt-ins stated that they believe they engaged in off-the-clock work.[55]

The opt-in Plaintiffs who did engage in uncompensated pre-shift waiting time also did not perform the same activities. Some Plaintiffs testified about engaging in safety meetings and donning PPE. Cox and Thompson stated that they were idle during this time.[56] Lewis testified that if he got to the job site early he would talk to the project manager and his crew would put on PPE.[57] Achane testified that the waiting time depended on whether the customer had the sign-in paperwork ready. Sometimes, he said the crew would have to get tools ready for about 15 minutes while they sorted out paperwork, but other customers would be good about having sign-in sheets ready when they arrived.[58] Given the standard that applies to determine whether pre-shift waiting time is compensable—whether the work is part of the employee's "principle activities"—these disparate employment experiences weigh against certification based on the existence of a pre-shift waiting time policy because the employment contexts differed, requiring individualized inquiries.

---

[54] Doc. 164-25 at 3 (Moseley Decl. ¶ 6). Plaintiffs' hearsay objection to the Moseley Declaration is denied. Defendant offers it as a summary under Fed. R. Evid. 1006, which is admissible "if offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined by the court." Plaintiffs filed the underlying questionnaire exhibits, as required by the rule. *See* Fed. R. Evid. 1006(c).

[55] *Id.*

[56] Doc. 169-1 at 83–84 (Cox Dep. 98:19–99:13), 270–72 (Thompson Dep. 97:11–98:25).

[57] *Id.* at 165 (Lewis Dep. 21:4–11).

[58] Doc. 164-20 at 8 (Achane Dep. 40:2–41:18).

### 2. Defenses

The second factor the Court must consider is whether there are defenses available to the Defendant that must be litigated on an individualized basis.[59] Defendant primarily relies on two defenses it claims will require individualized inquiry: its lack of knowledge that the opt-in Plaintiffs performed off-the-clock work and its damages defense.

As to both the travel and waiting time claims, Defendant asserts that it paid its employees based on the hours reflected on timesheets, relying on the accuracy of those timesheets. With respect to the travel policy claim, the Court disagrees that Defendant's timesheet defense requires individualized inquiries. As explained above, this claim is based on application of a uniform Labor Source policy. Moreover, Defendant dictated and administered the travel component of overnight workers' time. The evidence shows that for overnight travel projects, the employees met at a Labor Source branch and drove together in company vehicles to the customer's location. A jury could reasonably infer that the company was aware when it organized transportation to at least some distant customer locations that its employees were traveling beyond the 8:00 a.m. to 5:00 p.m. time period that Defendant's uniform policy deems compensable. Thus, the knowledge component of the claim based on Defendant's travel policy is amenable to collective proof.[60]

Defendant also argues that there is no representative evidence regarding damages in this case, and that Plaintiffs' inconsistent testimony makes it impossible to determine on a collective basis the amount of overtime hours worked by the opt-in Plaintiffs. Plaintiffs respond that this

---

[59] *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001).

[60] *See Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1287 (10th Cir. 2020) (finding evidence of knowledge where the claims were based on employer requirements); *Lozoya v. All Phase Landscape Constr., Inc.*, No. 12-CV-1048, 2014 WL 222104, at *4 (D. Colo. Jan. 21, 2014) ("Factual defenses in an FLSA collective action will necessarily be individualized any time employees worked different schedules. For purposes of determining FLSA class propriety, standardized pay policies present standardized defenses.").

argument is not relevant to the similarly-situated inquiry, and that Plaintiffs are not required to show individual proof of damages in this collective action. The Court agrees with Plaintiffs that potential differences in the compensable hours worked by the opt-in Plaintiffs does not require decertification.[61] To the extent some of the opt-in Plaintiffs were paid outside the hours of 8:00 a.m. to 5:00 p.m. because they were drivers, Plaintiffs maintain that there is sufficient proof in Labor Source's records to readily identify those employees. The Court finds this sufficient to proceed with collective proof on the travel time claim. Defendant's right to defend the damages claim in this case does not render collective treatment of the FLSA claim unmanageable or inefficient. These issues are routinely addressed in FLSA collective actions.[62] Thus, the second factor in the decertification analysis weighs in favor of Plaintiffs on the travel claim.

The Court finds that the second factor weighs in favor of decertification on the pre-shift waiting time claim. As with liability, the varied experiences of the opt-in Plaintiffs and lack of uniform policy create defenses that are not amenable to collective treatment.

---

[61] *Pruess v. Presbyterian Health Plan, Inc.*, 745 F. Supp. 3d 1218, 1252 (D.N.M. 2024); *Brayman v. KeyPoint Gov't Sols., Inc.*, 595 F. Supp. 3d 983, 994 (D. Colo. 2022), *rev'd in part, vacated in part on other grounds,* 83 F.4th 823 (10th Cir. 2023).

[62] *Perry v. Hardeman Cnty. Gov't*, No. 19-CV-01106, 2024 WL 2064465, at *12 (W.D. Tenn. May 8, 2024) (explaining that dispatchers' differing measures of damages based on different statutes of limitation did not weigh in favor of decertification and did not render collective treatment of the dispatchers' claims unmanageable); *Hodge v. N.C. Dep't of Pub. Safety*, No. 19-CV-478, 2024 WL 499523, at *11 (E.D.N.C. Feb. 8, 2024) ("It would be inefficient to deny the collective adjudication of these claims merely because the statute of limitations must be applied to each plaintiff individually when determining damages." (citation modified)); *Charbonneau v. Mortg. Lenders of Am. LLC*, No. 18-CV-02062-HLT-ADM, 2021 WL 84171, at *7 (D. Kan. Jan. 11, 2021) (concluding that statute of limitations defense and fact that some plaintiffs received backpay awards in DOL settlement did not require decertification); *see also McElwee v. Bryan Cowdery, Inc*., No. 21-CV-1265, 2023 WL 4423880, at *12 (S.D. Ohio July 10, 2023) ("If collective litigation would be efficient for liability but not damages, similarly situated plaintiffs should be permitted to proceed to trial collectively on liability, with damages addressed separately."); *Deakin v. Magellan Health, Inc*., No. 17-CV-00773, 2024 WL 3829737, at *13 (D.N.M. Aug. 14, 2024) (finding that when "generalized proof" applies to misclassification claims, collective treatment is appropriate even when damages may differ).

### 3. Fairness and Procedural Considerations

The third and final factor is fairness and procedural considerations. "The primary objectives of a § 216(b) collective action are: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity."[63] Here, Defendant does not argue that a collective adjudication of Plaintiffs' claims will not lower costs to the Plaintiffs. But Defendant urges that decertification is required to avoid prejudice and jury confusion, specifically because (1) collective treatment infringes on Defendant's right to challenge the evidence specific to each Plaintiff; (2) the opt-in Plaintiffs' statements are inconsistent and Defendant has a right to impeach each one about such inconsistencies. The Court is not persuaded by these arguments.

As explained in more detail above, Plaintiffs have set forth a common theory of liability on the travel time claim—that Defendant had a policy to not pay Plaintiffs overtime compensation for certain travel time worked in excess of 40 per week. In light of Plaintiffs' common theory of liability based on Defendant's uniform travel policy, proceeding with this case as a collective action represents a fair and efficient way to resolve the parties' dispute. In contrast, to the extent Defendant denied opt-in Plaintiffs compensable overtime pay for pre-shift waiting time, the evidence does not show that it was based on a company policy, that it was uniformly applied, or that the opt-in Plaintiffs collectively engaged in compensable pre-shift waiting time.

[63] *Charbonneau*, 2021 WL 84171, at *8 (alteration omitted) (quoting *Underwood v. NMC Mortg. Corp.*, No. 07-2268-EFM, 2009 WL 1322588, at *4 (D. Kan. May 11, 2009)).

The Court rejects Defendant's argument that proof by representative evidence will prejudice Defendants. While Defendants assert the need to challenge evidence specific to each Plaintiff, this argument could be raised in almost all collective actions with a substantial number of plaintiffs. Yet courts have long permitted the use of representative evidence to establish or defend against liability in class and collective actions.[64] The Court is confident that any individualized issues that might remain for trial can be managed through any number of trial management tools available to it.

Defendant points to inconsistencies between the opt-in Plaintiffs' statements and deposition testimony, and suggests that the opt-ins who were crew leads are in conflict with other opt-in Plaintiffs because they have an incentive to testify that they accurately recorded crew members' time on timesheets, while the other Plaintiffs have an incentive to testify that crew leads did not accurately record their time. The Court finds that these inconsistencies do not rise to the level of prejudice to Defendant if the case continues as a collective action. Many of the problems Defendant points to involve the waiting time claim that the Court decertifies. And to the extent some of the Plaintiffs were paid under the travel policy because they were drivers, Plaintiff maintains that Labor Source payroll records have a flag to demonstrate that.

The Court is persuaded that this case can be efficiently and fairly litigated through representative proof and that the overnight workers' FLSA claim premised on travel time should proceed on a collective basis.[65] Defendant's motion to decertify is denied as to the opt-in

---

[64] *See, e.g., Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454–55 (2016) (discussing the appropriate use of representative evidence and rejecting the argument that the use of such evidence in collective and class actions is unfair); *Mode v. S-L Distrib. Co.*, No. 3:18-CV-00150, 2021 WL 3921344, at *13 (W.D.N.C. Sept. 1, 2021) (rejecting defendant's argument that its inability to probe non-sample opt-ins would make proceeding as a collective unfair).

[65] As explained later in this opinion, the Court withholds ruling on the merits of Plaintiff's motion for representative evidence at trial until the time comes to devise a trial plan.

Plaintiffs subject to the travel time policy. The motion to decertify is granted as to the opt-in Plaintiffs' pre-shift waiting time claim.

## IV. Motion for Summary Judgment

Defendant moves for summary judgment on Plaintiffs' FLSA collective action claim on the following grounds: (1) they cannot show that Defendant knew or should have known that Plaintiffs worked unpaid overtime hours; and (2) they cannot show the amount of their unpaid overtime by "justifiable and reasonable inference."[66] In the alternative, Defendant seeks partial summary judgment on Plaintiffs' claim that the FLSA violation was willful and on the claims of four opt-in Plaintiffs for whom Labor Source has no record of employment.

Because the Court has now decertified the collective to the extent it is premised on unpaid wages for pre-shift waiting time, the only remaining waiting time claim is by Cox in his individual capacity. As described below, the Court grants Defendant's motion for summary judgment on Cox's waiting time claim. The Court also grants Defendant's motion for summary judgment as to the four opt-in Plaintiffs who have no record of employment at Labor Source: Yadira Ramon, Maria Portillo, Kenneth Shaw, Jr., and Frederick McCord. The Court denies Defendant's motion for summary judgment without prejudice to refiling on the remaining collective action claim based on Defendant's travel time policy.

### A. Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[67]

---

[66] *See, e.g.*, *McMillin v. Foodbrands Supply Chain Servs., Inc.*, 272 F. Supp. 2d 1211, 1218 (D. Kan. 2003) (stating that on an unpaid overtime claim, "the plaintiff must show that she actually worked overtime, that the amount of overtime was shown by justifiable and reasonable inference, and the employer had actual or constructive knowledge of the overtime." (quoting *Slattery v. HCA Wesley Rehab. Hosp., Inc.*, 83 F. Supp. 2d 1224, 1230 (D. Kan. 2000))).

[67] Fed. R. Civ. P. 56(a).

In applying this standard, a court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[68] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[69] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[70] An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[71]

The moving party must initially show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[72] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[73]

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[74] The nonmoving party may not simply rest upon its pleadings to satisfy this burden.[75] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from

---

[68] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[69] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[70] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).

[71] *Thomas v. Metro. Life Ins.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

[72] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[73] *Adams v. Am. Guar. & Liab. Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[74] *Anderson*, 477 U.S. at 256.

[75] *Id.*

which a rational trier of fact could find for the nonmovant."[76] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein."[77]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[78] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[79]

### B. Uncontroverted Facts

The following facts are either uncontroverted, stipulated, or viewed in the light most favorable to Plaintiffs as the nonmoving party.[80] The Court only recites facts that are material to the issues addressed on this motion.

Defendant provides workers to its customers, who perform manual labor for various projects within construction, manufacturing, fulfillment, disaster-restoration (including fire and

---

[76] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (2000)).

[77] *Adams*, 233 F.3d at 1246 (quoting *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.3d 1022, 1024 (10th Cir. 1992)).

[78] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[79] *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[80] Plaintiffs filed their summary-judgment exhibits as a single 618-page "Appendix" that includes no bookmarks. Doc. 169-1. This does not comply with the Court's procedures. Plaintiffs' counsel is directed to review the Court's local rules and administrative procedures, which require exhibits to be separately filed and labeled. D. Kan. Rule 5.2(e) ("Bulky or voluminous materials should not be filed in their entirety or incorporated by reference unless the court finds the materials essential and grants leave to file them. The court may strike any pleading or paper filed in violation of this rule."), D. Kan. Rule 7.1(e) ("The filing party must separately label any exhibits attached to motions or briefs and file an index of such exhibits."); Administrative Procedures For Filing, Signing, and Verifying Pleadings and Papers By Electronic Means in the United States District Court for the District of Kansas, Part IV.A.3 (rev. Feb. 2025) ("The filing party must separately label any exhibits and file an index of such exhibits."); *id.*, Part IV.B (setting forth procedure for filing voluminous exhibits).

water restoration) and other general labor fields. Defendant's customers pay Defendant based on the number of hours worked by Defendant's employees, including any overtime hours.

Defendant generally assigns a "crew lead" to each crew on out-of-town projects. Crew leads are not managers and have no authority to hire, fire, or discipline crew members, and they do not have management authority over customer projects. Instead, in addition to performing the same work as other crew members, crew leaders also serve as liaisons between the respective regional Labor Source office and the crew members, as well as with the customer's onsite project manager.

Defendant recruits its employees through its field offices and dispatches them to projects located throughout the country. Once hired, Defendant provides its overnight workers with documents to sign, including the OOT agreement. After receiving an OOT assignment, Plaintiffs meet at a field office, board company vans, and travel to overnight job sites together.

Immediately before workers departed the field office on any overnight travel job, Labor Source held a mandatory meeting conducted by either the General Manager or one of the Staffing Specialists. During this meeting, they reviewed house rules, job details, safety concerns, personal protective equipment to be used on the job, and time tracking rules. Labor Source does not keep records of the duration of the pre-departure meeting, and it does not pay workers for this time.

Defendant required its workers to stay in hotels for overnight travel jobs. When an out-of-town project ended, crew members returned to the field office in the company van.

Defendant's travel time policy compensates workers for travel time to overnight jobs if it occurs between 8:00 a.m. and 5:00 p.m, as stated in the OOT Agreement. Any travel time spent outside that window—whether before 8:00 a.m. or after 5:00 p.m.—is unpaid. Defendant pays

its employees the applicable minimum and overtime wage rates for travel time during those hours, including on corresponding non-working days. However, employees who drive to and from job locations are paid for all hours spent driving, even if outside the 8:00 a.m. to 5:00 p.m. window. Defendant pays its employees for commuting time when it was able to negotiate that payment with its customers.

Plaintiff Charles Cox is a North Carolina resident who was employed by Labor Source from September until January 2020 and worked on five overnight travel projects located in four different states. If Cox arrived at a job site before his scheduled start time, he would wait until all the crew members for that project arrived before beginning his shift. He would find out information about the project as he was walking into the job site.

### C. Discussion

#### 1. Cox's Waiting Time Claim

The Court has now decertified the collective action to the extent it alleges a claim for unpaid waiting time. Thus, the only remaining waiting time claim is by Cox in his individual capacity. Defendant does not separately move for summary judgment on Cox's individual claim; its arguments pertain only to the collective because it moved for summary judgment at the same time it moved to decertify the collective. However, the parties presented factual arguments and record evidence that allow the Court to consider whether summary judgment is warranted on Cox's individual waiting time claim.

As the Court explained when deciding the decertification motion, determining whether a pre-shift waiting time activity is compensable under the Portal-to-Portal Act "requires deciding what constitutes an employee's principal activity or activities. Courts have defined this phrase to

include both the principal activities themselves and all activities which are an integral and indispensable part of the principal activities."[81]

Viewing the evidence in the light most favorable to Cox, he has failed to demonstrate a genuine issue of material fact about whether he engaged in compensable pre-shift waiting time. According to Cox's deposition, he would often arrive at his job sites early, sometimes being delivered there directly after a long period of travel. When he arrived, he and his crew were required to wait for all of the other crews to arrive before they could start. He was just "[s]tanding in line waiting," and when they would walk to the project, "they" would tell them what the project would entail for that day.[82] Later, Cox executed a declaration, in which he estimates that he "was not paid for at least 5–10 hours of pre-shift idle time per week on each project."[83]

Plaintiff points to Cox's deposition testimony for the proposition that he "would get to the job site as early as 7:00 a.m., yet [was] not allowed to sign in until later start times, such as 9:15 a.m."[84] Cox's testimony does not support this assertion. Plaintiff cites the following exchange:

> Q. And do you know if you were on the clock at that point?
>
> A I – I guess because you said we only get paid – we – we're only obligated to get paid for the time that we work, correct, that's what you told me?
>
> Q. No, I'm just asking, do you know whether you were on the clock being paid for that time as you're walking in finding out what work you're going to do?

[81] *Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1276 (10th Cir. 2020) (citation modified).

[82] Doc. 166-18 at 11–12 (Cox Dep. 162:4–163:14).

[83] Doc. 169-1 at 8 (Cox Decl. ¶ 5).

[84] Doc. 169 at 11.

> A. No, I don't. I just – no. But I know they told us we wasn't getting paid for work – we were getting paid for work, and when we're working, so, I mean – and, I mean, I know we was getting there sometimes by seven o'clock so I know that those hours – them papers you showed me where it was like 9:15 and stuff like that, no.
>
> Q. Are there any – I'm not sure what you're referring to, but you're saying there were times –
>
> A. You showed me some papers that had that we had clocked in at 9:15 and stuff like that. It can't be accurate because we used to get to the job site at 7.[85]

The Court agrees with Defendant that this testimony does not demonstrate that Cox arrived at work at 7:00 a.m. but was not allowed to clock in until 9:15 a.m. Instead, this testimony was based on a document that counsel showed Plaintiff, which he appears to be confused about. Neither party provided a citation to this document in the summary judgment record.

Assuming that Cox's testimony and declaration support that he was required to arrive to his job site 15 minutes early, he admits that this time was generally spent "standing around," or "idle." Cox make no effort to explain how waiting in line, or otherwise being idle, is an integral and indispensable part of Cox's principal activities.[86] Nor does Cox's deposition testimony show that he was not paid for time spent receiving instructions before his shift started. He never directly answered that question from counsel, instead relying on "papers" to which neither party cites or provides to the Court.

---

[85] Doc. 166-18 at 12 (Cox Dep. 163:15–164:14).

[86] *See Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 35 (2014) (holding that time spent by employees undergoing security screenings were not compensatory because it was not integral and indispensable to the principal activity that the employees were employed to perform—retrieving products from warehouse shelves and packing them for shipment); *Steiner v. Mitchell*, 350 U.S. 247, 251 (1956) (holding that battery-plant employees engaged in compensable post-shift time spent showering and changing clothes because the chemicals in the plant were toxic).

In sum, in order for Cox to maintain a claim for unpaid waiting time, he must show that his time was compensable, meaning it was integral or indispensable to his principal activities.[87] Viewing the evidence in the light most favorable to him, Cox engaged in idle time and sometimes received instructions as he was walking to the job site. But Cox wholly fails to come forward with any evidence about the scope of his principal activities for Labor Source.[88] Thus, a reasonable jury could not find that Cox's pre-shift waiting time was spent on activities that were an "integral and indispensable part of the principal activities" of his job. Under *Busk*, "the question is 'tied to the productive work that the employee is *employed to perform*,'" not whether it is required by or benefits the employer.[89]

There is no genuine issue of material fact that Cox's idle waiting time was not tied to his productive work as a manual laborer. And while receiving instructions from a manager may very well be tied to his productive work, it is undisputed that when this occurred, it was while he was walking to a job site. There is no evidence in the record about whether, in these instances, Cox received instructions prior to or after his on-the-clock time began. Accordingly, Defendant's motion for summary judgment on the waiting time claim against Cox in his individual capacity is granted.

### 2. Collective's Travel Time Claim

The remaining FLSA collective action claim is that Defendant failed to pay the opt-in Plaintiffs compensable overtime due to its travel time policy that only pays employees for travel

---

[87] *See Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1277–78 (10th Cir. 2020).

[88] *Peterson v. Nelnet Diversified Sols., LLC*, 15 F.4th 1033, 1040–41 (10th Cir. 2021) ("[T]he result of that inquiry depends entirely on the work an individual is employed to perform.").

[89] *Aguilar*, 948 F.3d at 1276–77 (quoting *Busk*, 574 U.S. at 36).

that occurs between the hours of 8:00 a.m. and 5:00 p.m. With certain exceptions that do not apply here,

> employers engaged in interstate commerce are required by 29 U.S.C. § 207(a)(1) to pay overtime to employees who work more than forty hours in a work week. In addition to showing that he actually worked overtime in an amount that can be established by justifiable and reasonable inference, a plaintiff proceeding under § 207(a)(1) must also show that the employer had actual or constructive knowledge of the overtime.[90]

Defendant moves for summary judgment on the basis that there is no evidence it had knowledge that its employees were working unpaid overtime and that Plaintiffs cannot demonstrate the amount of overtime hours that were unpaid.

It is undisputed that Labor Source has a travel policy whereby it pays overnight workers travel time during "normal working hours." And each overnight worker is asked to sign the OOT Agreement, in which they agree that 8:00 a.m. to 5:00 p.m. "is a reasonable approximate of the normal day, inclusive of travel time."[91] There is also no dispute that Defendant pays *drivers* for all travel time, regardless of whether it falls within normal business hours. Thus, the only dispute is whether Defendant's travel policy, as applied to the opt-in Plaintiffs who were *passengers*, violates the FLSA.

As the Court stated with respect to the decertification motion, the Portal-to-Portal Act provides that "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" is generally not compensable when those activities occur "either prior to the time on any particular workday at

---

[90] *McGrath v. Cent. Masonry Corp.*, 276 F. App'x 797, 799 (10th Cir. 2008).

[91] Doc. 169-1 at 354.

which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities."[92]

The Tenth Circuit has advised that "employers are not required to compensate their employees for time spent 'traveling to and from' the place of their principal activities, and nothing in the statute indicates that there is a *per se* exception for employees just because they must travel with their co-workers."[93] Travel time must be "an integral and indispensable part of their principal activities" in order for it to be compensable.[94] And "an activity is not integral and indispensable to an employee's principal activities unless it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities."[95] Neither side directly address these standards in their briefing about travel time. Instead, they focus on the DOL regulations.

Plaintiffs rely on 29 C.F.R. § 785.38 to argue that their travel time was compensable. This regulation is an exception to the general rule that travel time is not compensable.[96] It provides that "[w]here an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice."[97] Plaintiff maintains that because employees were required to meet at the local branch office for a mandatory meeting before departing for their out-of-town job sites, all travel time should be compensated.

---

[92] 29 U.S.C. § 254(a), (d).

[93] *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1288 (10th Cir. 2006).

[94] *Id.*

[95] *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 35 (2014).

[96] *Senne v. Kan. City Royals Baseball Corp.*, 591 F. Supp. 3d 453, 533 (N.D. Cal. 2022).

[97] 29 C.F.R. § 785.38.

Defendant replies that § 735.38 only applies to travel within the workday, where the employee spends time "in travel as part of his principal activity, such as travel from job site to job site during the workday."[98] Defendant argues that § 785.39 applies instead because the type of travel at issue is to an out-of-town job site. Under § 785.39, "[t]ravel away from home is clearly worktime when it cuts across the employee's workday. The employee is simply substituting travel for other duties."[99] And "the [DOL] will not consider as worktime that time spent in travel away from home outside of regular working hours as a passenger on an airplane, train, boat, bus, or automobile."[100] Under the DOL's interpretive guidance, "in the rare case in which employees truly have no normal work hours, the employer and employee (or the employee's representatives) may negotiate and agree to a reasonable amount of time or timeframe in which travel outside of employees' home communities is compensable."[101] Defendant argues that they complied with 29 C.F.R. § 785.39 and the DOL's interpretive guidance by entering into the OOT Agreement with Plaintiffs who engaged in overnight travel and paying them during their normal work hours for their travel time.

Beyond disputing which regulation applies, neither party sufficiently engages with the issue of whether Plaintiffs' travel time was compensable. Plaintiffs assert that their travel time is compensable because they were required to meet at Labor Source's local branch and ride together in company vehicles to the customers' job sites. But they fail to address Defendant's argument that § 785.38 does not apply to out-of-town travel. Neither side discusses case law that

---

[98] *Id.*

[99] *Id.* § 785.39.

[100] *Id.*

[101] U.S. Dep't of Lab., Wage & Hour Div., Opinion Letter (Apr. 12, 2018).

may guide this Court's analysis.[102] And Plaintiffs wholly fail to explain how, or to what extent, their travel time claim encompasses commuting time between their hotels and out-of-town job sites.

The Court finds that whether Plaintiffs engaged in compensable travel time outside of their normal working hours is a threshold issue that should be addressed before the issues upon which Defendant moved for summary judgment—knowledge, recordkeeping, and willfulness. If Plaintiffs are entitled to unpaid travel time under the FLSA, it is because Plaintiffs engaged in compensable time for which they were not paid. And this determination impacts Defendant's motion on the issue of knowledge because when an employer's policy causes the FLSA violation, it is sufficient evidence of actual knowledge.[103] Moreover, only if these Plaintiffs engaged in a compensable activity does the Court need to consider whether Plaintiffs have submitted sufficient proof of unpaid overtime, or whether Defendant's violation was willful. Thus, the Court denies without prejudice Defendant's motion for summary judgment on the collective's travel time claim, but will permit Defendant another opportunity to move for summary judgment on this claim in light of the Court's ruling on the decertification motion. Defendant may renew its motion for summary judgment on the remaining collective action claim, including the issue of compensability, by October 30, 2026.

[102] *See, e.g.*, *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 35 (2014) (explaining the "integral and indispensable to principal activities" requirement); *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1288 (10th Cir. 2006) (considering whether rig hands engaged in compensable work under the FLSA for same-day travel to well sites); *see also Walters v. Pro. Lab. Grp., LLC*, 120 F.4th 546, 550–52 (7th Cir. 2024) (considering whether a staffing firm's failure to compensate its employees' travel time to and from overnight work during normal working hours was an FLSA violation); *Mendez v. Radec Corp.*, 232 F.R.D. 78, 86 (W.D.N.Y. 2005) ("Based on the record before me, I find as a matter of law that plaintiffs have established that, at least with respect to individual jobs, they did have "normal working hours," that they traveled to out-of-town job sites during those hours, and that they were not compensated for that travel time, in violation of the FLSA and 29 C.F.R. § 785.39. Plaintiffs are therefore entitled to summary judgment on this claim.").

[103] *Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1287 (10th Cir. 2020) ("[The employer] cannot simultaneously require an activity and claim to be unaware that employees are engaging in that activity.").

### 3. Individuals with no Record of Labor Source Employment

Finally, Defendant moves for summary judgment as to four individuals who filed consents to join but have no record of employment with Labor Source. Defendant points to a lack of evidence that Ramon, Portillo, Shaw, and McCord were employed by it, and Plaintiff does not dispute that there is no record of their employment. Because there is no evidence that these four individuals were employees within the meaning of the FLSA,[104] the Court grants Defendant's motion for summary judgment against these four individuals.

Plaintiffs suggest that these four Plaintiffs should be dismissed without prejudice. But because the Court grants summary judgment on the merits, their dismissal is with prejudice.[105]

## V. Motion to Allow Representative Testimony

Plaintiffs move to allow representative testimony on behalf of the remaining collective at trial by the 14 Plaintiffs who have been deposed. Defendant responds that it is premature to decide this motion before the motion to decertify is resolved and the parties are able to discuss a trial plan.[106] The Court agrees with Defendant. Given that the collective has been narrowed and another summary judgment motion may be forthcoming, the Court finds that Plaintiffs' motion to allow representative testimony should be denied without prejudice. Typically, the Court conducts a pretrial conference with the parties when summary judgment is denied, at which point pretrial filing deadlines are set, and the Court considers any other trial-related issues that the parties wish to raise. If this case proceeds to trial, the Court will direct the parties to meet and confer about a trial plan, and the Court will consider any issues that they cannot resolve at the

[104] 29 U.S.C. § 203(e)(1) (defining employee as "any individual employed by an employer").

[105] *See Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987) ("A grant of summary judgment resolves the issue on the merits and thus is with prejudice.").

[106] In the alternative, Defendant asks the Court to reject the use of representative testimony on the merits. The Court does not reach the merits of this issue in denying Plaintiff's motion without prejudice.

pretrial conference and direct briefing at that point if it determines it is necessary. Thus, the Court denies Plaintiffs' motion without prejudice.

## V. Conclusion

The Court has fully considered Defendant's motions to decertify and for summary judgment. The Court grants Plaintiff's request to narrow the collective to overnight workers and directs the parties to meet and confer to determine a list of opt-in Plaintiffs who should be dismissed without prejudice because they are no longer members of the amended collective. The Court denies the motion to decertify the collective comprised of overnight workers who claim they were denied overtime pay based on Defendant's travel time policy. The Court grants the motion to decertify the collective comprised of overnight workers who claim unpaid overtime solely based on pre-shift waiting time.

Because the Court determined that the narrowed collective should be decertified in part, it considered only Cox's individual waiting time claim and the collective's travel time claim on summary judgment. The Court grants Defendant's motion for summary judgment against Cox on his waiting time claim and on any claims asserted by the four opt-in Plaintiffs for whom there is no evidence of Labor Source employment. The Court otherwise denies the motion for summary judgment without prejudice. Defendant may renew its summary-judgment motion on the remaining FLSA collective action claim no later October 30, 2026

Finally, the Court denies without prejudice Plaintiffs' motion for representative testimony. It will direct the parties to meet and confer about a trial plan if summary judgment is denied and revisit this issue at that time if the parties cannot resolve it on their own.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Decertify Plaintiffs' FLSA Collective Action Claims (Doc. 163) is **granted in part and denied**

**in part**. The Court grants the motion as to opt-in Plaintiffs who seek overtime compensation for pre-shift waiting time only. The Court otherwise denies the motion to decertify. The Court certifies the following FLSA collective action based on Plaintiff's claim for unpaid travel time:

> All persons who are, or have been employed by Defendant as manual laborers and other individuals with similar job titles on overnight travel crews within the United States at any time during the last three years, except those who worked exclusively in North Carolina.

The parties are directed to meet and confer to determine the correct list of individuals who should be dismissed without prejudice from this action because they are no longer part of this narrowed collective. Plaintiffs shall file a Joint Status Report by no later than October 30, 2026, that advises the Court whether the parties have resolved the issue. If they have, the status report shall state the list of names that should be dismissed without prejudice, and Plaintiffs shall submit a proposed order of dismissal to the Court by email. If the parties cannot agree, the status report shall explain the dispute.

**IT IS FURTHER ORDERED** that Defendant's Motion for Full or Partial Summary Judgment (Doc. 165) is **granted in part and denied in part**. Defendant's motion for summary judgment is granted as to Cox's FLSA claim for pre-shift waiting time, and as to Yadira Ramon, Maria Portillo, Kenneth Shaw, Jr., and Frederick McCord. Defendant's motion for summary judgment is otherwise denied without prejudice, and Defendant may file a renewed motion for summary judgment no later than October 30, 2026.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Allow Representative Testimony (Doc. 171) is **denied without prejudice**.

**IT IS SO ORDERED.**

Dated: September 16, 2026

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE